# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MANUEL VALLIN, individually and on behalf of all others similarly situated,<br><br>                 Plaintiff,<br><br>v.<br><br>PNC INVESTMENTS, LLC;<br>PNC FINANCIAL SERVICES GROUP, INC.; and NATIONAL FINANCIAL SERVICES, LLC,<br><br>                 Defendants. | Case No.   2:24-cv-1295<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**TABLE OF CONTENTS**

I.     NATURE OF ACTION ............................................................................................ 1

II.    PARTIES ............................................................................................................... 2

III.   JURISDICTION AND VENUE ............................................................................ 2

IV.    FACTUAL ALLEGATIONS ................................................................................. 3

       A.  Background on Cash Sweep Accounts ........................................................ 3

       B.  Defendants' Cash Sweep Program .............................................................. 5

       C.  Defendants' Duties to Plaintiff and Class Members ................................... 7

             1.     Contractual Duties ............................................................................ 7

             2.     Duties Imposed by Law .................................................................... 8

       D.  Defendants Breached Their Legal and/or Contractual Duties to PNCI
           Customers ................................................................................................... 9

       E.  Plaintiff's Experience ............................................................................... 12

V.     CLASS ACTION ALLEGATIONS .................................................................... 12

VI.    CAUSES OF ACTION ....................................................................................... 15

PRAYER FOR RELIEF ................................................................................................. 20

DEMAND FOR JURY TRIAL ...................................................................................... 20

Plaintiff Manuel Vallin, individually and on behalf of all others similarly situated, alleges the following based on his personal experience and his counsel's investigation:

## I. NATURE OF ACTION

1.      Plaintiff brings this proposed class action suit against Defendants PNC Investments, LLC ("PNCI"); PNC Financial Services Group, Inc. ("PNCFSG"); and National Financial Services, LLC ("NFS") (collectively, "Defendants") based on the Defendants' unlawful actions and conduct with respect to the cash sweep program they operate.

2.      PNCI recommends to retail and advisory customers who have uninvested cash that they hold such monies in what is known as a "cash sweep account" where they can earn interest. PNCI's cash sweep account is known as the PNC Priority Bank Deposit Sweep Program and was created and developed by PNCI in conjunction with NFS (hereafter, "PNC Sweep Program"). Plaintiff and Class members are clients with PNCI whose uninvested cash was automatically swept into very low interest-bearing accounts with PNCI's affiliated bank, PNC Bank, pursuant to the PNC Sweep Program.

3.      At all relevant times, Defendants had legal and/or contractual duties to act in the best interests of Plaintiff and the proposed Class members. Unfortunately for Plaintiff and Class members, Defendants breached their legal and/or contractual duties to them. Defendants automatically enrolled Plaintiff and Class members in the PNC Sweep Program and offered them no other investment vehicles for their uninvested cash. Defendants then caused Plaintiff's and Class members' uninvested cash to be deposited with PNC Bank, which pays low and unreasonable rates of return, but paid Defendants significant and higher fees at the expense of PNCI's customers. As a result, Defendants generated massive revenues for themselves while paying PNCI customers a pittance.

4.      Plaintiff alleges that Defendants' conduct was unlawful, as described in further detail below, and alleges on behalf of himself and all others similarly situated claims for breach of fiduciary duty, breach of contract, gross negligence, breach of the implied covenant of good

faith and fair dealing, and unjust enrichment. Plaintiff seeks all available monetary and equitable relief, including damages, disgorgement, restitution, and all other appropriate relief.

## II.    PARTIES

5.    Plaintiff Manuel Vallin is a resident and citizen of Eufaula, Alabama.

6.    Defendant PNC Financial Services Group, Inc. is headquartered in Pittsburgh, Pennsylvania and incorporated in Pennsylvania. PNC Financial Services Group, Inc. is one of the largest financial services institutions in the United States, with over $500 billion in assets. PNC Financial Services Group, Inc. is the parent company of PNC Investments, LLC and is named as a defendant in its capacity as the parent company and control person of PNC Investments, LLC.

7.    Defendant PNC Investments, LLC is headquartered in Pittsburgh, Pennsylvania and incorporated in Delaware. PNC Investments, LLC is a registered investment adviser and broker-dealer and a member of the Financial Industry Regulatory Authority.

8.    National Financial Services, LLC, is headquartered in Boston, Massachusetts and incorporated in Delaware. National Financial Services, LLC is one of the largest providers of brokerage services in the country. National Financial Services, LLC is the clearing broker for PNC Investments, LLC.

## III.    JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which one or more members of the proposed Class, including Plaintiff, are citizens of a state different from Defendants. The Court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

10.    This Court may exercise jurisdiction over Defendants because they are either headquartered in this District; have sufficient minimum contacts in this District; and/or intentionally avail themselves of the markets within this District through the promotion, sale, and

marketing of their services, thus rendering the exercise of jurisdiction by this Court proper and necessary.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because two Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims emanated from this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Background on Cash Sweep Accounts

12.     A "cash sweep" or "sweep" account is generally linked to a brokerage account and holds uninvested money, such as the initial cash deposits into a brokerage account before the cash is invested in a security, or cash customers prefer to remain uninvested. The uninvested cash is "swept" into an interest-bearing account to ensure it is not sitting idly not generating income.

13.     Today, cash sweep programs work by automatically "sweeping" uninvested cash each day into one or more banks that are usually affiliated with the brokerage firm. Historically, uninvested client cash sat with brokerage firms on their balance sheets, but in the 1960s, brokerage firms started depositing the cash with banks in the form of certificates of deposit. In early 2000, Merrill Lynch began offering the type of sweep accounts or programs that are available today and later other brokerage firms, like Charles Schwab, did the same.

14.     The Security and Exchanges Commission ("SEC") defines a sweep program as a "service provided by a broker or dealer where it offers to its customers the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product . . . or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." 17 C.F.R. 240.15c3-3(a)(17).

15.     Brokerages like PNCI have significant discretion in the creation of their cash sweep programs. For example, they can create money market funds as the sweep vehicles for their customers' uninvested cash. They also have discretion regarding the banks that they will use.

16.    The amount of uninvested client cash that brokerage firms hold is around $1 trillion dollars. Reports from January 2024 indicate that PNCI parent, PNCFSG, had $26 billion in interest bearing deposits including CDs and cash sweeps.

17.    Brokerage firms and affiliate banks earn significant net interest income (or "spread")—that is, the difference between the rate of interest earned by custodians loaning and investing the sweep deposits and the interest paid to brokerage customers.

18.    The amounts that Brokerage firms earn under sweep programs are based on their agreements with the banks they partner with to run their cash sweep programs. The agreements generally provide compensation to the brokerage firms based on the average daily deposits at the affiliated banks, and the total compensation is generally based on the Federal Funds rate plus basis points.

19.    For some time, Federal Fund rates—the interest rate at which banks lend each other money and which is set by the Federal Open Market Committee—were low and so it was expected that earned interest on cash sweeps would be low. But in 2022, however, the Federal Funds rate increased considerably as the following chart shows:

| YEAR | AVE. YIELD | YEAR HIGH | YEAR LOW | YEAR CLOSE | ANNUAL % CHANGE |
|------|-----------|-----------|----------|------------|-----------------|
| 2024 | 5.33% | 5.33% | 5.33% | 5.33% | 0.00% |
| 2023 | 5.03% | 5.33% | 4.33% | 5.33% | 23.09% |
| 2022 | 1.68% | 4.33% | 0.08% | 4.33% | 6085.71% |

20.    With the rise of the Federal Fund rate, banks increase yields and so brokerages should have been able to negotiate higher rates of return on uninvested cash. Unfortunately, that has not been the case with some firms such as PNCI. Instead, PNCI places sweep deposits with PNC Bank that it negotiates with to pay less than reasonable interest rates to customers and more money for itself.

21.    The SEC has stepped up its investigation into brokerage cash sweep programs. For example, according to a Wells Fargo & Co. filing in November 2023, the company disclosed that

the SEC "has undertaken an investigation regarding the cash sweep options that the company provides to investment advisory clients at account opening."

22.    Morgan Stanley reported a similar investigation in a quarterly earnings report: "Since April 2024, the firm has been engaged with and is responding to requests for information from the Enforcement Division of the SEC regarding advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940[.]"

23.    As described in Part C below, brokerage firms owe a fiduciary duty to act in the best interests of their customers, including with respect to their clients' uninvested cash holdings.

**B.    Defendants' Cash Sweep Program**

24.    PNCI, along with its co-defendants, designed and developed the PNC Sweep Program in a manner that puts their financial interests above that of PNCI customers and generates massive revenues for themselves at the expense of PNCI customers. Defendants had a lot of discretion with how to structure and implement the PNC Sweep Program. For example, Defendants could have created a money market fund as a vehicle for PNCI customers' uninvested cash. Unlike some of its competitors, PNCI does not provide an alternative sweep avenue beyond depositing its customers' uninvested cash into low interest-bearing deposit accounts with PNC Bank.

25.    Under the program currently, PNCI automatically assigns all of its customers to the PNC Sweep Program. It is not just the only recommended investment strategy for PNCI customer's uninvested cash, it is the only available cash sweep vehicle. The program is not discretionary, and PNCI customers are not offered alternative cash sweep vehicles, such as a money market fund, when opening an account or afterwards.

26.    Under the PNC Sweep Program, uninvested cash balances are automatically swept each day into interest bearing deposit accounts set up by PNCI and NFS following the day of deposit and into an account with PNC Bank. PNC Bank is the only bank that participates in the PNC Sweep Program.

27.    The terms of the PNC Sweep Program are set forth in the PNCI "Retirement Account Customer Agreement" or "Brokerage Account Customer Agreement," and a document

titled, "PNC Investments, LLC Proprietary Bank Deposit Sweep Program (BDSP$^{SM}$) Disclosure Document" (together "Brokerage Agreement").

28.     The Brokerage Agreement specifically acknowledges that PNCI is obligated under federal law to provide interest rates that "are believed to be fair and reasonable" and "negotiated at arm's length" for its PNC Sweep Program because it includes retirement accounts. However, the Brokerage Agreement does not limit this obligation to obtain fair and reasonable rates for retirement accounts, and indeed they do not vary based on brokerage account type.

29.     Yet, the deposit accounts in the PNC Sweep Program have unreasonably low rates of return. For example, June 2023 to the present, the interest rates paid to customers with cash sweep deposits have been paltry: from 0.05% to approximately 1.55% for only the highest deposit amounts. The chart below shows examples of PNCI's rates in effect as of September 6, 2024:

| Cash balance | APY Effective 6/20/23 |
|---|---|
| $0-$499,999.99 | 0.05% |
| $500,000-$999,999.99 | 0.10% |
| $1,000,000.00-$1,999,999.99 | 0.35% |
| $2,000,000.00 or more | 1.55% |

30.     For comparison, as of August 19, 2024, the national average interest rate on a savings account was 0.46% according to the FDIC.[1]

31.     In contrast to PNCI customers who have earned low rates of return on their uninvested cash, Defendants have earned significant net interest income from the PNC Sweep Program. PNCFSG earned net interest income of $3.3 billion in the second quarter of 2024. Deposits in PNCI's Sweep Program grew by 2% in the second quarter of 2024 as well.

32.     Defendants have earned massive revenues because they placed their interests above Plaintiff and Class members' interests by placing cash sweep deposits with an affiliated bank partner that pays little interest to customers and pays larger fees and interest to Defendants.

---

[1] https://www.fdic.gov/resources/bankers/national-rates (last accessed September 11, 2024).

6

Moreover, PNCI was obligated to negotiate, at arm's length, a reasonable rate with PNC Bank. There are no provisions in the Brokerage Agreement, that allow Defendants to place their financial interests above PNCI's customers' best interests in this manner.

33.     While PNCI customers received artificially and unreasonably low rates, Defendants received a larger share of the spread at PNCI customers' expense. Had Defendants obtained reasonable rates for PNCI customers, they would have earned less. Defendants put their financial interests ahead of that of PNCI customers instead and were able to handsomely line their pockets with massive revenues.

34.     In failing to obtain reasonable rates for PNCI customers, Defendants breached their contractual and/or fiduciary obligations, as alleged and described herein.

### C.     Defendants' Duties to Plaintiff and Class Members
#### 1.  Contractual Duties

35.     The PNC Sweep Program was devised and operated by Defendants. In doing so, Defendants drafted the terms and disclosures that govern the PNC Sweep Program, and Defendants are bound to fulfill their obligations under the contract they drafted.

36.     In operating the PNC Sweep Program, NFS agreed to act as an agent on behalf of PNCI's clients in establishing their deposit accounts with PNC Bank. The Brokerage Agreement states that "As your agent, NFS is establishing the Deposit Accounts at [PNC Bank], depositing funds into the Deposit Accounts, withdrawing funds from Deposit Accounts and transferring funds between Deposit Accounts." Thus, in establishing the cash sweep program, NFS had to put the best interest of PNCI customers first over its own interests and deposit the uninvested balances in accounts that paid reasonable interest rates.

37.     PNCI is also contractually obligated to act as an agent on behalf of its clients. The Brokerage Agreement states, "I appoint [PNCI] as my agent for the purposes of carrying out my directions to [PNCI] in accordance with the terms and conditions of this Agreement with respect to the purchase or sale of securities in my account."

38.     Additionally, the Brokerage Agreement requires Defendants to negotiate a reasonable interest rate, at arm's length, on behalf of PNCI customers. But Defendants failed to do so.

39.     Moreover, Regulation Best Interest ("Reg. BI") governs the scope of PNCI's relationship with Plaintiff and Class members. Reg. BI applies only to retail investors, i.e., natural persons, or their legal representatives, who receive recommendations primarily for personal, family, or household purposes. 17 C.F.R. § 240.15l-1(b)(1).

40.     Pursuant to Reg. BI, in its role as a broker-dealer, PNCI is required to act in its clients' best interests when it makes recommendations to them, "without placing the financial or other interest of the broker-dealer ahead of the interests of the retail customer[.]"

41.     In program materials, PNCI represents to clients that, "Regardless of whether you select a brokerage account or an advisory account, we will not place the interest of PNCI or our Financial Advisors ahead of yours. That means that both recommendations we make for brokerage accounts and advice we give in our advisory programs will be made in what we believe is in your best interest."

42.     As agents and/or pursuant to contractual obligations, Defendants were required to act in PNCI's customers' best interests and not put their own personal gain ahead of PNCI customers.

43.     In failing to negotiate higher and reasonable rates for PNCI customers during the operation of the PNC Sweep Program, Defendants breached their contractual duties to customers.

## 2.  Duties Imposed by Law

44.     In acting as an investment adviser for an actively managed client account, PNCI owes its clients a fiduciary duty under federal law. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

45.     Pursuant to these regulations, PNCI was obligated to "serve the best interest of its client and not subordinate its client's interests to its own." *Id.* And PNCI cannot "place its own interests ahead of the interests of its client." *Id.*

46.     PNCI customers are also owed a duty of care, and PNCI is required to use its skills and expertise for the benefit of its clients.

47.     PNCI owes a similar duty of care to its retail clients pursuant Reg. BI, 17 C.F.R. § 240.15l-1.

48.     Like SEC conduct rules, Reg. BI also requires PNCI to "act in the retail customer's best interest and cannot place its own interests ahead of its customer's interests." 84 Fed. Reg. 33318, 33320.

49.     Reg. BI "draw[s] on key principles underlying fiduciary obligations, including those that apply to investment advisers under the Advisers Act, while providing specific requirements to address certain aspects of the relationships between broker-dealers and their retail clients." 84 Fed. Reg. 33318, 33320 (July 12, 2019).

50.     Additionally, for retirement accounts—discretionary or non-discretionary—under 26 U.S.C. § 4975(d)(4), the investment of a retirement plan's full or partial cash assets in deposits must "bear a reasonable interest rate in a bank or similar financial institution," otherwise the deposit of uninvested cash from a retirement account into the PNC Sweep Program would be a prohibited transaction under Section 4975 of the Internal Revenue Code. This requirement ensures that transactions involving retirement accounts by related parties such as those between a plan sponsor like PNCI, NFS, and PNC bank are made at fair market rates.

51.     As described and alleged herein, PNCI failed to abide by its fiduciary duties and act in the best interest of its customers as set forth under federal law.

### D.     Defendants Breached Their Legal and/or Contractual Duties to PNCI Customers

52.     Defendants breached their fiduciary and/or contractual duties by developing and creating a cash sweep program that elevated their interests over Plaintiff and Class members,

including by failing to negotiate, at arm's length, higher reasonable interest rates for PNCI customers' deposits in operating the PNC Sweep Program.

53.    Through their contractual and legal duties, Defendants were obligated to act in the best interest of PNCI's customers consistent with the Brokerage Agreement. Devising a cash sweep program that allows them to extract excessive fees from PNCI customers' cash sweep deposits, through the negotiation of unreasonably low interest rates with PNC Bank, was against PNCI's customers' interests.

54.    Defendants recommended the PNC Sweep Program as an investment strategy by automatically enrolling PNCI customers into it and giving them no other options. Defendants, however, did not negotiate higher reasonable rates of interest for customers' cash sweep deposits, but instead worked in consultation with its affiliated bank partner to set artificially and unreasonably low interest rates.

55.    The Department of Labor defined a "reasonable" rate of interest in 2003 and suggested one way of determining a "reasonable" rate is to refer to rates "offered by other banks" or by "money market funds."[2]

56.    Compared to competing products, the PNC Sweep Program's interest rates are substantially lower than similar sweep products offered by other financial institutions.

57.    The rates of four of PNC's competitors are provided in the table below:

/ / /

/ / /

/ / /

---

[2] 68 Fed. Reg. 34646, at 34648 (June 10, 2003)

| PNC Competitor | Cash Sweep Interest Rate |
|---|---|
| Interactive Brokers[3] | 4.83% |
| MooMoo[4] | 5.1% |
| Vanguard[5] | 4.5% |
| Webull[6] | 5.0% |

58.    Not only are Defendants' interest rates significantly lower than that of competitors, but they are also substantially lower than interest rates for money market fund rates.

59.    Many competitors offer programs that sweep uninvested cash into money market funds where their customers receive substantially higher returns on their cash.

60.    For example, competitor Fidelity offers a program that sweeps uninvested cash into money market funds that earn approximately 5%.[7] Vanguard's sweep program offers money market funds as an option as well, with yield rates also around 5%.[8] But Defendants automatically place customers into the cash sweep programs they have developed with low yield rates they negotiated with an affiliated bank.

61.    Defendants could offer a money market fund as a cash sweep vehicle, in fact, the Brokerage Agreement states that "in rare instances where we are unable to place your funds at [PNC Bank], your funds will be invested in a money market mutual fund selected by us." Instead, Defendants obligate customers to sweep their uninvested cash into the PNC Sweep Program with substantially lower returns.

---

[3] https://www.interactivebrokers.com/en/accounts/fees/pricing-interest-rates.php (last accessed August 7, 2024).
[4] https://www.moomoo.com/us/invest/cashsweep (last accessed August 7, 2024).
[5] https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last accessed August 7, 2024).
[6] https://www.webull.com/cash-management (last accessed August 7, 2024).
[7] https://www.fidelity.com/go/manage-cash-rising-costs (last accessed August 8, 2024).
[8] https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account and https://investor.vanguard.com/investment-products/money-markets (last accessed August 8, 2024).

62.     By negotiating substantially lower rates for the cash sweep programs Defendants automatically placed Plaintiff and Class members into, Defendants did not act in PNCI's customers' best interest and instead acted in their own financial interests, making massive net income revenue at PNCI's customers' expense.

### E.     Plaintiff's Experience

63.     Plaintiff Manuel Vallin has a retirement account with Defendants. Defendants recommended the PNC Sweep Program as an investment strategy for his uninvested cash by automatically enrolling him in the PNC Sweep Program at the time he opened his account in 2022.

64.     Plaintiff Vallin's uninvested cash is automatically swept into the bank that Defendants select in their discretion at the low interest rates alleged herein, pursuant to the PNC Sweep Program.

65.     For example, Plaintiff Vallin is currently earning only .05% on his uninvested cash.

### V.     CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action individually and on behalf of all other persons similarly situated (the "Nationwide Class") pursuant to the Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4) initially defined as follows:

> All persons who had cash deposits or balances in the PNC Sweep Program.

67.     The Nationwide Class is referred to herein as "Class."

68.     Excluded from the proposed Class are Defendants, any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants; and judicial officers to whom this case is assigned and their immediate family members.

69.     Plaintiff reserves the right to re-define the Class definition after conducting discovery.

70.    **Numerosity (Fed. R. Civ. P. 23(a)(1))**. The Class members are so numerous that joinder of all members is impracticable. The precise number of Class members and their identities are unknown to Plaintiff currently. However, PNC reportedly has over 100,000 clients and over $23 billion in assets under management.[9] The parties will be able to identify Class members and the exact size of the Class through discovery and Defendants' records.

71.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3))**. Common questions of law and fact exist for each of the claims and predominate over questions affecting only individual members of the Class. Questions common include, but are not limited to, the following:

    a.   Whether Defendants owed fiduciary duties to Plaintiff and Class members in the operation of the PNC Sweep Program;

    b.   Whether Defendants breached their fiduciary duties to Plaintiff and Class members in the operation of the PNC Sweep Program;

    c.   Whether Defendants breached the contract with Plaintiff and Class members in the operation of the PNC Sweep Program;

    d.   Whether Defendants' interest rates paid to Plaintiff and Class members were unreasonable;

    e.   Whether the fees and interest Defendants collected from the PNC Sweep Program for themselves were unreasonable;

    f.   Whether Defendants breached the implied covenant of good faith and fair dealing;

    g.   Whether Defendants are liable for gross negligence to Plaintiff and Class members in the operation of the PNC Sweep Program;

    h.   Whether Defendants have been unjustly enriched because of the conduct complained of herein; and

---

[9] *See* https://money.usnews.com/financial-advisors/firm/pnc-investments-129052 (last visited Sept. 6, 2024).

      i.    Whether Plaintiff and Class members are entitled to relief, including damages and equitable relief.

72.    **Typicality (Fed. R. Civ. P. 23(a)(3))**. Pursuant to Rule 23(a)(3), Plaintiff's claims are typical of the claims of the Class members. Plaintiff, like all Class members, was paid an unreasonable interest rate in connection with the PNC Sweep Program. Accordingly, Plaintiff's claims are typical of other Class member's claims because they arise from the same course of conduct by Defendants, and the relief sought is common to Class members.

73.    **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**. Pursuant to Rule 23(a)(4), Plaintiff and his counsel will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to, or in conflict with, the interests of the Class members. Plaintiff has retained counsel experienced in prosecuting class actions and breach of fiduciary cases.

74.    **Superiority (Fed. R. Civ. P. 23(b)(3))**. Pursuant to Rule 23(b)(3), a class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class members because the amount of monetary relief available to individual plaintiffs is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

75.    **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may properly be maintained as a class action, because:

      a.    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Defendants; or

b.  the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

76.     **Issue Certification (Fed. R. Civ. P. 23(c)(4))**. In the alternative, the common questions of fact and law, set forth in Paragraph 70, are appropriate for issue certification on behalf of the proposed Class.

### VI. CAUSES OF ACTION

### <u>COUNT I</u>
### BREACH OF FIDUCIARY DUTY

77.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

78.     Defendants owed fiduciary duties to Plaintiff and Class members, arising out of the Brokerage Agreement, Regulation Best Interest, and 84 Fed. Reg. 134, 17 C.F.R. § 276. Defendants' fiduciary duties arose out of Defendants' recommendations made to Plaintiff and Class members via automatic enrollment of Plaintiff and Class members into the PNC Sweep Program and from Defendants' contractual obligations to serve as Plaintiff and Class members' agents under the Brokerage Agreement, including Defendants' holding and control over uninvested cash that belonged to its clients, such as Plaintiff and Class members.

79.     In connection with the operation of the PNC Sweep Program and the governing Brokerage Agreement, Defendants owed duties to Plaintiff and Class members who had traditional and retirement brokerage accounts. Defendants' duties to Plaintiff and Class members, include, but

are not limited to: (a) a duty of care to act in their best interests; (b) a duty to not place Defendants' interests above Plaintiff's and Class members'; (c) a duty to use reasonable diligence, care, and skill when making recommendations; (d) a duty to avoid conflicts of interest; (e) a duty to disclose conflicts of interests; and (f) a duty to secure reasonable rates of interest on uninvested cash.

80. Defendants breached their duties to Plaintiff and Class members by, among other things: (a) failing to act in their best interests, which was to negotiate and pay a higher and reasonable interest rate on Plaintiff's and Class members' cash balances; (b) placing their own interests ahead of Plaintiff's and Class members' interests by securing increased net interest income for themselves at the expense of Plaintiff and Class members; (c) failing to use reasonable diligence, care, and skill when operating the PNC Sweep Program; (d) failing to avoid or mitigate conflicts of interests; and (e) failing to disclose Defendants' conflict of interest.

81. As a direct and proximate result of Defendants' misconduct as alleged herein, Plaintiff and Class members suffered damages in that they did not earn higher and reasonable rates of interests, in amounts to be determined at trial. Plaintiff seeks disgorgement of any undue and unjust gains of Defendants, punitive damages, as well as all other equitable relief deemed just and proper.

82. Defendants' conduct also warrants a punitive damage award because Defendants are guilty of oppression and engaged in conduct that is outrageous and exhibited reckless indifference to the rights of its clients, including Plaintiff and Class members.

## COUNT II
## GROSS NEGLIGENCE

83. Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

84. Defendants owed Plaintiff and Class members the duty to exercise reasonable diligence, care, and skill in recommending the PNC Sweep Program.

85.     Defendants breached their duties by failing to act in the best interests of Plaintiff and Class members, including by not negotiating, at arm's length, and paying the available reasonable interest rates on the cash balances in their clients' accounts; and by placing their own interests ahead of Plaintiff's and Class members' interests by securing increased net interest income at the expense of their clients.

86.     Defendants' conduct as alleged in this Complaint was grossly negligent because their self-serving conduct demonstrates a complete lack of care and reckless disregard for their clients' interests. Defendants' conduct also demonstrates an extreme departure from the ordinary standard of care.

87.     Defendants' gross negligence directly and proximately caused harm to Plaintiff and the Class members. As a result, Plaintiff and Class members suffered damages in an amount to be determined at trial.

## <u>COUNT III</u>
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

88.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

89.     The Brokerage Agreement, entered into by Defendants on the one hand and Plaintiff and Class members on the other, provides that Massachusetts law applies to services offered by Defendants, including the PNC Sweep Program.

90.     Under Massachusetts common law, a covenant of good faith and fair dealing is implied into every contract.

91.     Plaintiff and Class members contracted with Defendants to provide them with financial and/or investment services, pursuant to the Brokerage Agreement. Under the Brokerage Agreement, Defendants were agents of Plaintiff and Class members and owed them fiduciary duties, including to act in their best interests. Defendants failed to obtain for Plaintiff and Class members higher and reasonable rates of return on their cash balances and instead acted in

Defendants' own interests. Moreover, under the Brokerage Agreement, and pursuant to Reg. BI and 84 Fed. Reg. 134, 17 C.F.R. § 276, Defendants had a duty to act in the best interests of Plaintiff and Class members and not put their interests above Plaintiff and Class members.

92.    These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the covenants that Defendants would act fairly and in good faith in carrying out their contractual obligations to provide Plaintiff and Class members with fair and reasonable rates of return on their cash sweep balances.

93.    Defendants breached these implied covenants of good faith and fair dealing by failing to provide Plaintiff and Class members with fair and reasonable rates of return on their cash sweep balances. Defendants, instead of providing fair and reasonable rates of return on their clients' cash sweep balances, provided far below market rates of return that their clients could have otherwise earned on their cash. Defendants acted dishonestly and failed to exercise and/or abused their discretion in selecting the banks which would hold Plaintiff's and Class members' cash balances and in failing to negotiate reasonable rates of interest but instead negotiated higher rates of interest and fees for themselves.

94.    Plaintiff and Class members fulfilled all the terms and obligations of their contract, including paying for Defendants' services.

95.    Defendants' failure to act in good faith in providing fair and reasonable rates of return on their customers' cash sweep balances denied Plaintiff and Class members the full benefit of their bargain. Plaintiff and Class members received a minimal return on their cash sweep balances that were less than what they could have otherwise earned and less than their reasonable expectations under their contract with Defendants.

96.     As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

## COUNT IV
## BREACH OF CONTRACT

97.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

98.     Plaintiff and Class members entered into the Brokerage Agreement, whereby Defendants are obligated to provide Plaintiff and Class members with financial services, including a contractual obligation to negotiate for Plaintiff and Class members rates of return on their cash balances that are reasonable and to otherwise act in the best interest of the clients in the operation of the PNC Sweep Program.

99.     Pursuant to the Brokerage Agreement, Defendants were and continue to be contractually obligated to obtain for Plaintiff and Class members rates of return on their cash sweep balances that are reasonable and to otherwise act in the best interests of the clients in the operation of the PNC Sweep Program.

100.    As alleged herein, the rates of return paid to Plaintiff and Class members on their cash sweep balances were not fair and reasonable, and neither were the increase interest payments and fees that Defendants extracted for themselves when negotiating with the affiliated bank, PNC Bank. As a result, Defendants breached the contract with Plaintiff and Class members.

101.    Accordingly, Plaintiff and Class members were harmed by Defendants' breach; and sustained damages in an amount to be determined at trial.

## COUNT V
## UNJUST ENRICHMENT

102.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

103.    Because of Defendants' wrongful conduct as alleged herein, Plaintiff and Class members received lower interest payments on their cash sweep balances than they would have in a reasonable and fair market.

104.    Because of Defendants' wrongful conduct as alleged herein, Defendants unjustly received a benefit at the expense of Plaintiff and Class members in the form of increased interest income that belonged to Plaintiff and Class members.

105.    It would be unjust and inequitable to allow Defendants to retain these wrongfully obtained benefits.

106.    Plaintiff and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class defined above, respectfully request that this Court enter:

(a) An order certifying this case as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiff as the Class representative, and appointing the undersigned as Class counsel;

(b) A judgment awarding Plaintiff and Class members appropriate monetary relief, including actual damages, equitable relief, restitution, and disgorgement;

(c) An order entering injunctive and declaratory relief as appropriate under the applicable law;

(d) An order awarding Plaintiff and the Class pre-judgment and/or post-judgment interest as prescribed by law;

(e) An order awarding reasonable attorneys' fees and costs as permitted by law; and

(f) All other and further relief as may be just and proper.

//

//

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: September 11, 2024

*/s/ Gary F. Lynch*
Gary F. Lynch (PA ID No. 56887)
Connor P. Hayes (PA ID No. 330447)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
gary@lcllp.com
connorh@lcllp.com

Eric H. Gibbs*
Rosemary M. Rivas*
Rosanne L. Mah*
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
(510) 350-9700 (tel.)
(510) 350-9701 (fax)
ehg@classlawgroup.com
rmr@classlawgroup.com
rlm@classlawgroup.com
*\*pro hac vice forthcoming*

Brian E. Johnson*
**GIBBS LAW GROUP LLP**
211 N. Union St., Suite 100
Alexandria, VA 22314
(510) 350-9700 (tel.)
(510) 350-9701 (fax)
bej@classlawgroup.com
*\*pro hac vice forthcoming*

*Attorneys for Plaintiff Manuel Vallin*