**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MANUEL VALLIN and JOEL BROWNE, individually and on behalf of all others similarly situated,<br><br><br>               Plaintiffs,<br><br>v.<br><br>PNC INVESTMENTS, LLC and<br>PNC FINANCIAL SERVICES GROUP, INC.,<br><br><br>               Defendants. | Case No. 2:24-cv-01295-KT<br><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

TABLE OF CONTENTS

I.      NATURE OF ACTION .............................................................................................1

II.     PARTIES ................................................................................................................2

III.    JURISDICTION AND VENUE ..............................................................................3

IV.     CHOICE OF LAW ..................................................................................................3

V.      FACTUAL ALLEGATIONS ..................................................................................3

        A.   Background on Cash Sweep Accounts.......................................................3

        B.   Defendants' Cash Sweep Program ............................................................5

        C.   Defendants' Duties to Plaintiffs and Class Members................................9

             1.   Contractual Duties ............................................................................ 9

             2.   Duties Imposed by Law.................................................................... 10

        D.   Defendants Breached Their Legal and/or Contractual Duties to PNC Customers........11

             1.   PNC's Rates are Substantially Lower than Its Competitors' Rates .......................... 12

             2.   Savings and Money Market Deposit Accounts ............................... 15

        E.   Plaintiffs' Experiences .............................................................................16

VI. CLASS ACTION ALLEGATIONS ..............................................................................17

VII.    CAUSES OF ACTION ..........................................................................................20

        COUNT I
        BREACH OF FIDUCIARY DUTY ........................................................................20

        COUNT II
        GROSS NEGLIGENCE ..........................................................................................21

        COUNT III
        BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING............22

        COUNT IV
        BREACH OF CONTRACT .....................................................................................23

        COUNT V
        UNJUST ENRICHMENT ......................................................................................24

PRAYER FOR RELIEF ....................................................................................................25

DEMAND FOR JURY TRIAL .........................................................................................25

Plaintiffs Manuel Vallin and Joel Browne, individually and on behalf of all others similarly situated, allege the following based on their personal experiences and their counsel's investigation:

## I.    NATURE OF ACTION

1.    This proposed class action suit against Defendants PNC Investments, LLC ("PNCI") and PNC Financial Services Group, Inc. ("PNCFSG") (collectively, "PNC" or "Defendants") arises out of the Defendants' actions and conduct with respect to the cash sweep program they operate.

2.    PNC automatically enrolls customers with uninvested cash (or cash balances) in their brokerage accounts into what is known as a "cash sweep" account. PNC's cash sweep program is known as the PNC Investments, LLC Proprietary Bank Deposit Sweep Program (hereafter, "PNC Sweep Program") and was created and developed by PNC.

3.    Plaintiffs and Class members are customers with advisory (or discretionary) and self-managed (non-discretionary) brokerage accounts, including retirement accounts, with PNC. Plaintiffs' and Class members' cash balances were automatically swept into interest-bearing accounts with PNC's affiliated bank, PNC Bank, pursuant to the PNC Sweep Program.

4.    At all relevant times, Defendants had legal and/or contractual duties to Plaintiffs and the proposed Class to obtain fair and reasonable rates on their cash balances.

5.    In operating the PNC Sweep Program, however, Defendants breached their legal and/or contractual duties to Plaintiffs and Class members. Defendants caused Plaintiffs' and Class members' cash balances to be deposited with PNC Bank, their affiliate, who set the interest rates on cash deposits. Defendants paid Plaintiffs and Class members unfair and unreasonable rates of return, as low as 0.05%, although competing brokerages paid higher interest rates, including as high as 5%. Instead of paying Plaintiffs and Class members fair and reasonable interest rates consistent with their legal and contractual obligations, Defendants and their affiliates paid themselves unreasonable fees generated from the revenue earned on Plaintiffs' and Class members' cash balances.

6.      In many situations, Plaintiffs and Class members trusted Defendants with their retirement savings and/or already pay Defendants advisory fees. As a result of their practices, Defendants were able to generate massive revenues and profits for themselves and their affiliates while paying PNC customers a pittance. Put simply, Defendants prioritized their financial gain and put their customers' interests last.

7.      Plaintiffs allege that Defendants' conduct was unlawful, as alleged in further detail below, and on behalf of themselves and all others similarly situated, allege claims for breach of fiduciary duty, breach of contract, gross negligence, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Plaintiffs seek all available monetary and equitable relief, including damages, restitution, an injunction, and all other appropriate relief.

## II.      PARTIES

8.      Plaintiff Manuel Vallin is a resident and citizen of Eufaula, Alabama.

9.      Plaintiff Joel Browne is a resident and citizen of Enola, Pennsylvania.

10.     Defendant PNC Financial Services Group, Inc. is headquartered in Pittsburgh, Pennsylvania and incorporated in Pennsylvania. Its headquarters are at 300 Fifth Avenue, The Tower at PNC Plaza, Pittsburgh, PA 15222. PNC Financial Services Group, Inc. is one of the largest diversified financial services institutions in the United States, with businesses in retail banking and asset management, among other things. It has over $500 billion in assets. PNC Financial Services Group, Inc. is the parent company of PNC Investments, LLC and is named as a defendant in its capacity as the parent company and control person of PNC Investments, LLC.

11.     Since at least 2019, PNC Financial Services Group, Inc. has regularly reported in its public filings on the positive impact its cash sweep products (at issue in this case), have had on its business. For example, PNC Financial Services Group, Inc.'s public filings with the SEC reference the lucrative financial results stemming from the PNC Sweep Program (specifically, exhibits filed in connection with SEC Forms 8K from October 2019 through November 2024).

12.     Defendant PNC Investments, LLC, is headquartered in Pittsburgh, Pennsylvania and incorporated in Delaware. Its headquarters are at 300 Fifth Avenue, The Tower at PNC Plaza,

Pittsburgh, PA 15222. PNC Investments, LLC, is a registered investment adviser and broker-dealer and a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation. PNC Investments, LLC is a wholly owned subsidiary of PNC Financial Services Group, Inc.

### III.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least one hundred members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which one or more members of the proposed Class, including one Plaintiff, are citizens of a state different from Defendants. The Court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

14.     This Court may exercise jurisdiction over Defendants because they are headquartered in this District; have sufficient minimum contacts in this District; and/or intentionally avail themselves of the markets within this District through the promotion, sale, and marketing of their services, thus rendering the exercise of jurisdiction by this Court proper and necessary.

15.     Venue is proper in this District under 28 U.S.C. § 1391 because two Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims emanated from this District.

### IV.     CHOICE OF LAW

16.     Massachusetts law governs Plaintiffs' and Class members' claims by virtue of the choice of law provision selecting Massachusetts law in the relevant account agreements.

### V.     FACTUAL ALLEGATIONS

#### A.     Background on Cash Sweep Accounts

17.     A "cash sweep" or "sweep" account is typically linked to a brokerage account and holds uninvested money, such as the initial cash deposits into a brokerage account before the cash

is invested in a security, or cash customers prefer to remain uninvested. The uninvested cash is "swept" into an interest-bearing account to ensure that the cash is not sitting idle and not generating income.

18.     Today, cash sweep programs work by automatically "sweeping" uninvested cash each day into one or more banks that may be affiliated with the brokerage firm. Historically, uninvested client cash sat with brokerage firms on their balance sheets, but in the 1960s, brokerage firms started depositing the cash with banks in the form of certificates of deposit. In early 2000, Merrill Lynch began offering the type of sweep accounts or programs that are available today and later other brokerage firms, like Charles Schwab, did the same.

19.     Brokerages like PNC have significant discretion in the creation of their cash sweep programs. They also have discretion regarding the banks that they partner with.

20.     Brokerage firms collectively hold around $1 trillion dollars at any given time in uninvested cash. Reports from January 2024 indicate that PNC Financial Services Group, Inc. had $26 billion in interest bearing deposits including CDs and cash sweeps.

21.     Brokerage firms and affiliated banks earn significant net interest income (or "spread")—that is, the difference between the rate of interest earned by custodians loaning and investing the sweep deposits and the interest paid to brokerage customers.

22.     The amount of money that brokerage firms earn under their sweep programs is based on their agreements with the banks they partner with to run their cash sweep programs. The agreements generally provide compensation to the brokerage firms based on the average daily deposits at the affiliated banks, and the total compensation is generally based on the Federal Funds Rate plus basis points.

23.     For some time, Federal Fund rates—the interest rate at which banks lend each other money, and which is set by the Federal Open Market Committee—were low and so it was expected that earned interest on cash sweeps would be low. But in 2022, the Federal Funds Rate increased considerably as the following chart shows:

| YEAR | AVE. YIELD | YEAR HIGH | YEAR LOW | YEAR CLOSE | ANNUAL % CHANGE |
|------|-----------|-----------|----------|------------|-----------------|
| 2022 | 1.68% | 4.33% | 0.08% | 4.33% | 6085.71% |
| 2023 | 5.03% | 5.33% | 4.33% | 5.33% | 23.09% |
| 2024 | 5.33% | 5.33% | 5.33% | 5.33% | 0.00% |

24.     With the rise of the Federal Fund Rate, banks increase yields and so brokerages should have been able to negotiate and pay customers higher rates of return on uninvested cash.

25.     Unfortunately, that has not been the case with some firms, including PNC. Instead, PNC places deposits with PNC Bank, which sets the interest rates. The revenue that Defendants and their affiliates generate and retain for themselves results in lower than fair and reasonable rates paid on PNC customers' uninvested cash.

26.      The SEC has stepped up its investigation into brokerage cash sweep programs. For example, according to a Wells Fargo & Co. filing in November 2023, the company disclosed that the SEC "has undertaken an investigation regarding the cash sweep options that the company provides to investment advisory clients at account opening."

27.     Morgan Stanley reported a similar investigation in a quarterly earnings report: "Since April 2024, the firm has been engaged with and is responding to requests for information from the Enforcement Division of the SEC regarding advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940[.]"

28.     As described in Part C below, brokerage firms owe fiduciary duties to act in the best interests of their customers, including with respect to their clients' uninvested cash holdings.

### B.    Defendants' Cash Sweep Program

29.     Defendants designed and developed the PNC Sweep Program in a manner that puts their financial interests above that of PNC customers and generates massive revenues for themselves at the expense of PNC customers. Defendants had discretion in how to structure and implement the PNC Sweep Program.

30. Under the program currently, PNC automatically assigns all its customers to the PNC Sweep Program. It is the only available cash sweep vehicle for consumers.

31. There are generally two types of PNC customers: advisory clients and self-managed clients. Advisory clients are clients with brokerage accounts managed by PNC; that is, PNC makes the decision on what stocks to buy and sell, while self-managed customers are responsible for their own buying and selling decisions. Advisory clients pay PNC a fee to have an investment advisor manage their account. Investment advisors must use their skills, expertise, and discretion in the best interests of their clients when managing their clients' funds. Regardless of whether a PNC customer has an advisory or self-managed account, their uninvested cash is automatically swept into an FDIC-insured, interest-bearing deposit account with PNC Bank pursuant to the PNC Sweep Program.

32. Defendants have complete control over which banks are part of the PNC Sweep Program and PNC Bank exercises control over the rates that are paid in the PNC Sweep Program. Interest rates paid in the PNC Sweep Program to customers are "determined by PNC Bank," with guidance from PNC Investments.

33. Under the PNC Sweep Program, uninvested cash balances are automatically swept each day into FDIC insured, interest bearing deposit accounts set up by PNC following the day of deposit and into an account with PNC Bank. PNC Bank is the only bank that participates in the PNC Sweep Program.

34. The terms of the PNC Sweep Program are set forth in Defendants' "Retirement Account Customer Agreement" or "Brokerage Account Customer Agreement," and incorporates by reference a document titled, "PNC Investments, LLC Proprietary Bank Deposit Sweep Program (BDSP$^{SM}$) Disclosure Document" (together "Brokerage Agreement").

35. The Brokerage Agreement specifically acknowledges that PNC is obligated under federal law to provide interest rates that "are believed to be fair and reasonable" and "negotiated at arm's length" for its PNC Sweep Program because it includes retirement accounts. This provision broadly applies to all types of accounts.

36.    Defendants and their affiliates monitor the revenue they receive from the PNC Sweep Program. In determining the interest rates to pay customers in the PNC Cash Sweep Program, PNC Bank considers cash sweep product interest rates paid in the marketplace, and economic conditions, including the Federal Funds rate.

37.    Despite the higher rates consistently paid on cash sweep products offered by competitors in the marketplace that are FDIC insured and interest bearing like those here, Defendants have consistently offered unfair and unreasonable interest rates in the PNC Sweep Program.

38.    For example, from June 2023 to September 11, 2024, when this case was filed, the interest rates paid to all customers with cash sweep deposits were paltry: from 0.05% for cash balances below $500,000 to approximately 1.55% for only the highest deposit amounts. Even though the Federal Funds Rate increased dramatically from 2022 to 2023 and remained stable in 2024, PNC's rates remained unreasonably low. The chart below shows PNC's rates in effect as of September 6, 2024 for all customers:

| Cash balance | APY Effective 6/20/23 |
|---|---|
| $0-$499,999.99 | 0.05% |
| $500,000-$999,999.99 | 0.10% |
| $1,000,000.00-$1,999,999.99 | 0.35% |
| $2,000,000.00 or more | 1.55% |

39.    After the filing of this case, PNC slightly increased the cash sweep rates for advisory clients in the PNC Sweep Program, but the rates for self-managed accounts remained the same. The chart below shows PNC's rates for advisory accounts in effect as of October 1, 2024:

| Cash balance | APY Effective 10/01/24 |
|---|---|
| $0-$99,999.99 | 0.33% |
| $100,000-$249,999.99 | 0.48% |
| $250,000-$499,999.99 | 0.83% |
| $500,000-$999,999.00 | 0.93% |
| $1,000,000-$4,999,999.99 | 1.94% |
| $5,000,000.00 or more | 2.19% |

40.     The unfairness and unreasonableness of PNC's sweep rates is also evident by just looking at the national average interest rate on FDIC insured savings deposit accounts, which as of September 16, 2024, was 0.46% according to the FDIC.[1]

41.     Given the rates paid on similar cash sweep products in the marketplace, the Federal Funds rate, and other potential benchmarks described herein, Defendants had no reasonable basis to believe that the interest rates paid in the PNC Sweep Program were fair and reasonable. Indeed, PNC Bank is a participating bank in William Blaire's cash sweep program, and William Blaire has paid its customers interest rates of 2.25%, indicating that Defendants and its affiliates did not believe that the interest rates paid to PNC customers was fair and reasonable.

42.     In contrast to PNC customers—who have earned unfair and unreasonably low rates of return on their uninvested cash—Defendants have earned significant net interest income from the PNC Sweep Program. PNCFSG earned net interest income of $3.3 billion in the second quarter of 2024. Deposits in PNC's Sweep Program grew by 2% in the second quarter of 2024 as well.

43.     As the Federal Funds Rate increased dramatically beginning in 2022, going from less than 1% to as high as 5.3% in the middle of 2023 and thereafter remaining steady, PNC customers should have seen substantial interest rate increases for their uninvested cash in the PNC Sweep Program, but did not.

44.     Defendants have earned massive revenues because they placed their interests above Plaintiffs' and Class members' interests by placing cash sweep deposits with an affiliated bank partner that pays little interest to customers and pays larger fees and interest to Defendants. Moreover, PNC was obligated to negotiate, at arm's length, fair and reasonable rates with PNC Bank. Instead, PNC abdicated control over the interest rates to PNC Bank, and then PNC and their affiliates profited handsomely from their clients' uninvested cash while their clients received minimal returns. There are no provisions in the Brokerage Agreement that allow Defendants to place their financial interests above PNC's customers' best interests in this manner.

---

[1] https://www.fdic.gov/resources/bankers/national-rates (last accessed October 16, 2024).

45.    While PNC customers receive artificially, unfair and unreasonably low interest rates on uninvested cash, Defendants receive a larger share of the spread at PNC customers' expense. Had Defendants obtained fair and reasonable rates for PNC customers, they would have earned less. Defendants put their financial interests ahead of PNC customers instead and were able to handsomely line their pockets with massive revenues.

46.    In failing to obtain reasonable rates for PNC customers, Defendants breached their contractual and/or fiduciary obligations, as alleged and described herein.

### C.    Defendants' Duties to Plaintiffs and Class Members
#### 1.  Contractual Duties

47.    The PNC Sweep Program was devised and operated by Defendants. In doing so, Defendants drafted the terms governing the PNC Sweep Program, and Defendants are bound to fulfill their obligations under the contract they drafted.

48.    PNC is also contractually obligated to act as an agent on behalf of its clients. The Brokerage Agreement states, "I appoint [PNC] as my agent for the purposes of carrying out my directions to [PNC] in accordance with the terms and conditions of this Agreement…."

49.    Additionally, the Brokerage Agreement requires Defendants to negotiate fair and reasonable interest rates, at arm's length, on behalf of PNC customers. But Defendants failed to do so.

50.    Moreover, as brokers under the Brokerage Agreement, Regulation Best Interest ("Reg. BI") governs the scope of PNC's relationship with Plaintiffs and Class members. 17 C.F.R. § 240.15I-1(b)(1).

51.    Pursuant to Reg. BI, in its role as a broker-dealer, PNC is required to act in its clients' best interests when it makes recommendations to them, "without placing the financial or other interest of the broker … ahead of the interests of the retail customer[.]"

52.    In program materials, PNC represents to clients that, "Regardless of whether you select a brokerage account or an advisory account, we will not place the interest of PNC or our

Financial Advisors ahead of yours. That means that both recommendations we make for brokerage accounts and advice we give in our advisory programs will be made in what we believe is in your best interest."

53.    As agents and/or brokers and pursuant to contractual obligations, Defendants were required to act in PNC's customers' best interests and not put their own personal gain ahead of PNC customers.

54.    In failing to negotiate and/or pay fair and reasonable rates for PNC customers during the operation of the PNC Sweep Program, Defendants breached their contractual duties to customers. Defendants also breached their contractual obligations to only charge fair and reasonable fees designed to approximate the value of the services involved and in the context of the customers' assets. This is evidenced by the larger interest rates paid by Defendants' competitors. Brokerage firms that pay higher interest rates on cash sweep deposits, collect less fees. Since Defendants paid less than fair and reasonable interest rates, they and their affiliates collected unfair and unreasonable fees.

### 2.    Duties Imposed by Law

55.    In acting as an investment adviser on behalf of clients with actively managed advisory accounts, PNC owes clients a fiduciary duty under federal law. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

56.    Pursuant to these regulations, PNC was obligated to "serve the best interest of its client and not subordinate its client's interests to its own." *Id.* And PNC cannot "place its own interests ahead of the interests of its client." *Id.*

57.    In addition to the duty of loyalty, PNC customers are also owed a duty of care, and PNC is required to use its skills and expertise for the benefit of its clients.

58.    PNC owes a similar duty of care to its retail clients pursuant Reg. BI, 17 C.F.R. § 240.15l-1.

59.     Like SEC conduct rules, Reg. BI also requires PNC to "act in the retail customer's best interest and cannot place its own interests ahead of its customer's interests." 84 Fed. Reg. 33318, 33320.

60.     Reg. BI "draw[s] on key principles underlying fiduciary obligations, including those that apply to investment advisers under the Advisers Act, while providing specific requirements to address certain aspects of the relationships between broker-dealers and their retail clients." 84 Fed. Reg. 33318, 33320 (July 12, 2019).

61.     Additionally, for retirement accounts—advisory or self-managed—under 26 U.S.C. § 4975(d)(4), the investment of a retirement plan's full or partial cash assets in deposits must "bear a reasonable interest rate in a bank or similar financial institution," otherwise the deposit of uninvested cash from a retirement account into the PNC Sweep Program would be a prohibited transaction under Section 4975 of the Internal Revenue Code. This requirement ensures that transactions involving retirement accounts by related parties such as those between a plan sponsor like PNC and PNC bank are made at fair market rates. This provision is specifically designed to protect consumers from situations like here, where the assets are held by a bank that is affiliated with the same firm providing the advisory services. 26 U.S.C. § 4975(e)(2)(B).

62.     As described and alleged herein, PNC failed to abide by its fiduciary duties and act in the best interest of its customers as set forth under federal law.

**D.      Defendants Breached Their Legal and/or Contractual Duties to PNC Customers**

63.     Defendants breached their fiduciary and/or contractual duties by developing and creating a cash sweep program that elevated their interests over Plaintiffs and Class members, including by failing to negotiate, at arm's length, fair and reasonable interest rates for PNC customers' deposits in operating the PNC Sweep Program.

64.     Through their contractual and legal duties, Defendants were obligated to act in the best interest of PNC's customers consistent with the Brokerage Agreement and state and federal law. Devising a cash sweep program that allows them and their affiliates to generate and earn

revenues that result in unfair and unreasonably low interest rates to PNC customers, was against PNC's customers' best interests and constitutes an actual conflict of interest that existed at the time the PNC Sweep Program was devised and implemented. At no point did Defendants disclose to Plaintiffs and Class members that the revenue generated and retained by them and their affiliates would result in unfair and unreasonable rates paid on uninvested cash.

65.    Defendants automatically enrolled PNC customers into the PNC Sweep Program and gave them no other options. Defendants, however, did not negotiate higher reasonable rates of interest for customers' cash sweep deposits, but instead supposedly provided "guidance" to their affiliated bank partner to set artificially unfair and unreasonably low interest rates so that they could pay themselves more of the spread.

66.    The Department of Labor defined a "reasonable" rate of interest as follows:

A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as the sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.[2]

67.    Additionally, the Internal Revenue Service defines an "arm's length interest rate" as, "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[3]

68.    When compared to competing products, and using other rates as reference, the PNC Sweep Program's interest rates do not have the characteristics of a "fair and reasonable" rate of interest negotiated at arm's length.

### 1.    PNC's Rates are Substantially Lower than Its Competitors' Rates

69.    The PNC Sweep Program's interest rates are unfair and unreasonable because they are substantially lower than the Fed Funds rate, competing brokerage's sweep vehicles—interest

---

[2] 68 Fed. Reg. 34646, at 34648 (June 10, 2003)
[3] 26 CFR § 1.482-2(a)(2).

bearing, FDIC insured deposit accounts—offered in the marketplace, and other benchmarks identified herein.

70.    For example, the top five brokerages in the United States based on the amount of assets under management are: Vanguard, Charles Schwab, Fidelity Investments, JPMorgan Chase & Co., and Merrill Wealth Management.[4] These brokerage firms offer sweep products similar to the PNC Sweep Program, in that the sweep accounts are FDIC insured, interest bearing, available for retirement accounts, and capable of automatically transferring cash from brokerage accounts. Based on historical data since May 2023, the combined, average interest rate over the past 19 months paid by Vanguard, Charles Schwab, Fidelity Investments, JPMorgan Chase & Co., and Merrill Wealth Management on similar cash sweep products for cash balances below $100,000.00 is 2.74% when considering the advisory rates of JPMorgan and Merrill Wealth Management. The combined, average interest rate over the past 19 months paid by Vanguard, Charles Schwab, Fidelity Investments, JPMorgan Chase & Co., and Merrill Wealth Management on similar cash sweep products for cash balances below $100,000 is 1.52%, when considering the non-advisory rates of JPMorgan Chase & Co. and Merrill Wealth Management.

71.    When comparing Defendants' interest rates (paragraphs 38-39 above) to the combined, average interest rate paid over the past 19 months by the top five brokerages based on assets under management, it is clear that Defendants' interest rates are not fair and reasonable.

72.    A fair and reasonable interest rate on cash sweep deposits, however, is likely higher than even the figures set forth in Paragraph 69 because those averages include non-advisory rates paid by JPMorgan Chase & Co. and Merrill Wealth Management that are also not fair and reasonable. In fact, JPMorgan Chase & Co. and Merrill Wealth Management have been sued for paying less than reasonable interest rates on cash sweep deposits of non-advisory rates.

---

[4] https://money.usnews.com/investing/articles/5-largest-brokerage-firms-of-2024 (last visited Dec. 13, 2024).

73.    Interest rates paid on cash sweep products offered by other PNC competitors that are comparable to Defendants' sweep product (interest bearing, FDIC insured, etc.) can also be considered to show that Defendants' rates are unfair and unreasonable:

| PNC Competitor | Cash Sweep Interest Rate |
|---|---|
| MassMutual[5] | 0.95% |
| MooMoo[6] | 4.6% |
| RW Baird[7] | 1.66% |
| TIAA-CREF[8] | 0.95% |
| Vanguard[9] | 4.15% |
| Webull[10] | 4.25% |
| William Blaire[11] | 2.25% |

74.    PNC's competitors have consistently offered higher interest rates over the years. For example, in August of 2022, Vanguard offered 2.25% on its cash sweep program, while PNC offered only 0.09% in September of 2022.

75.    With respect to advisory customers, PNC competitor JPMorgan paid advisory customers a substantially higher rate of 4.9% in October 2024.[12] And Merrill Lynch paid advisory customers 4.73% in October 2024.[13]

---

[5] https://www.massmutual.com/investment/cash-sweep-programs (last accessed October 17, 2024).

[6] https://www.moomoo.com/us/invest/cashsweep (last accessed October 17, 2024).

[7] https://www.rwbaird.com/cashsweeps/ (last accessed October 17, 2024).

[8] https://www.tiaa.org/public/invest/financial-products/brokerage-accounts/interest-rate-disclosure

[9] https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last accessed October 17, 2024).

[10] https://www.webull.com/cash-management (last accessed October 17, 2024).

[11] https://www.williamblair.com/Private-Wealth-Management/Bank-Deposit-Sweep-Program/Interest-Rate-Tiers (last accessed October 17, 2024).

[12] https://www.chase.com/personal/investments/sweep-options-yields (last accessed October 17, 2024).

[13] https://olui2.fs.ml.com/Publish/Content/application/pdf/GWMOL/ICCRateSheet.pdf (last accessed on October 17, 2024).

## 2.    Savings and Money Market Deposit Accounts

76.    Another comparator for determining the reasonableness of the PNC Sweep Programs interest rates are savings accounts and money market deposit accounts.

77.    Both account types are FDIC insured, interest-bearing deposit accounts similar in kind to the deposit accounts that are opened with PNC Bank as part of the PNC Sweep Program.

78.    In June 2023, the national average interest rate for savings accounts was 0.42% while the average interest rate for money market deposit accounts was 0.61%,[14] while PNCI customers earned as little as 0.05% on their uninvested cash in the PNC Sweep Program.

79.    The national average interest rate on savings deposit accounts and money market deposit accounts remained high through September of 2024. In September 2024 the national average interest rate on savings accounts was 0.46% while the average interest rate for money market deposit accounts was 0.64%.[15] PNC's rates remained flat during that same period at 0.05%.

80.    While the national average for a typical savings account was 0.46%, some banks, including PNC Bank, offer so-called high-yield savings accounts with substantially higher rates.

81.    These high-yield savings accounts, sometimes called high-interest savings accounts, are FDIC insured, interest-bearing deposit accounts—like the deposit accounts that are used in the PNC Sweep Program.

82.    Many banks offer such accounts, including PNC Bank. PNC Bank's high-yield savings account has an annual percentage yield of 4.25%.[16] Moreover, a number of banks offer rates similar to PNC Bank on high-yield savings accounts. The table below offers examples:

///

///

---

[14] https://www.fdic.gov/national-rates-and-rate-caps/national-rates-and-rate-caps-23 (last accessed October 17, 2024).

[15] https://www.fdic.gov/national-rates-and-rate-caps (last accessed October 17, 2024).

[16] https://www.pnc.com/en/personal-banking/banking/savings/high-yield-savings.html (last accessed October 18, 2024).

| PNC Competitor | High-yield Savings Account Rate[17] |
|---|---|
| American Express | 4.10% |
| Betterment | 5.00% |
| Capital One | 4.10% |
| Discover | 4.10% |
| SoFi | 4.30% |
| Vanguard | 4.15% |

83.     By taking fees for themselves and their affiliates that are unfair and unreasonable, and hence more of the net interest income for themselves and their affiliates such that the interest rates paid to Plaintiffs and Class members are below fair and reasonable rates, Defendants elevated their financial interests above their clients' best interests in breach of their legal duties and obligations.

### E.    Plaintiffs' Experiences

84.     Plaintiff Manuel Vallin has a self-managed retirement account with Defendants. Defendants automatically enrolled him in the PNC Sweep Program at the time he opened his account in 2022.

85.     Plaintiff Vallin's uninvested cash is automatically swept with PNC Bank at the low interest rates alleged herein.

86.     For example, Plaintiff Vallin is currently earning only 0.04% on the uninvested cash in his retirement account.

87.     Plaintiff Joel Browne had an advisory/discretionary retirement account managed by Defendants from December 2022 until September 2024. Defendants enrolled him in the PNC Sweep Program at the time he opened his account in 2022.

88.     Plaintiff Browne's uninvested cash was automatically swept with PNC Bank at the low interest rates alleged herein.

---

[17] Rates as of October 18, 2024, available at https://www.investopedia.com/best-high-yield-savings-accounts-4770633#:~:text=Pibank%20%E2%80%93%205.50%25%20APY,below%20in%20order%20of%20APY (last accessed October 18, 2024).

89.     At the time he closed his account, Plaintiff Browne earned only 0.05% on the uninvested cash in his retirement account.

## VI.    CLASS ACTION ALLEGATIONS

90.     Plaintiffs bring this action individually and on behalf of all other persons similarly situated (the "Nationwide Class") pursuant to the Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4) initially defined as follows:

> All persons in the United States who had cash deposits or balances in the PNC Sweep Program from September 11, 2018 to the present.

91.     The Nationwide Class is referred to herein as "Class."

92.     Excluded from the proposed Class are Defendants, any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants; and judicial officers to whom this case is assigned and their immediate family members.

93.     Plaintiffs reserve the right to re-define the Class definition after conducting discovery.

94.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**. The Class members are so numerous that joinder of all members is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs currently. However, PNC reportedly has over 100,000 clients and over $23 billion in assets under management.[18] The parties will be able to identify Class members and the exact size of the Class through discovery and Defendants' records.

95.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3))**. Common questions of law and fact exist for each of the claims and predominate over questions affecting only individual members of the Class. Common questions include, but are not limited to, the following:

---

[18] *See* https://money.usnews.com/financial-advisors/firm/pnc-investments-129052 (last visited Sept. 6, 2024).

a.  Whether Defendants' interest rates paid to Plaintiffs and Class members on uninvested cash were unfair and unreasonable;

b.  Whether the fees Defendants and their affiliates retained from the revenue generated from Plaintiffs' and Class members' uninvested cash were unfair and unreasonable;

c.  Whether Defendants breached their fiduciary duties to Plaintiffs and Class members;

d.  Whether Defendants breached the Brokerage Agreement with Plaintiffs and Class members;

e.  Whether Defendants breached the implied covenant of good faith and fair dealing;

f.  Whether Defendants are liable for gross negligence to Plaintiffs and Class members in the operation of the PNC Sweep Program;

g.  Whether Defendants have been unjustly enriched because of the conduct complained of herein; and

h.  Whether Plaintiffs and Class members are entitled to relief, including damages and equitable relief.

96.     **Typicality (Fed. R. Civ. P. 23(a)(3))**. Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs, like all Class members, were paid unfair and unreasonable interest rates in connection with the PNC Sweep Program. Accordingly, Plaintiffs' claims are typical of other Class member's claims because they arise from the same course of conduct by Defendants, and the relief sought is common to Class members.

97.     **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**. Pursuant to Rule 23(a)(4), Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Plaintiffs have no interests antagonistic to, or in conflict with, the interests of the Class members. Plaintiffs have retained counsel experienced in prosecuting class actions and breach of fiduciary cases.

98.    **Superiority (Fed. R. Civ. P. 23(b)(3))**. Pursuant to Rule 23(b)(3), a class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class members because the amount of monetary relief available to individual plaintiffs is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

99.    **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may properly be maintained as a class action, because:

    a.    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Defendants; or

    b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

    c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

100.    **Issue Certification (Fed. R. Civ. P. 23(c)(4))**. In the alternative, the common questions of fact and law identified herein are appropriate for issue certification on behalf of the proposed Class.

## VII.    CAUSES OF ACTION

### <u>COUNT I</u>
### BREACH OF FIDUCIARY DUTY

101.    Plaintiffs re-allege and incorporate by reference all paragraphs as if fully set forth herein.

102.    Defendants owed fiduciary duties, including the duty of care and duty of loyalty, to Plaintiffs and Class members. Defendants' fiduciary duties arose out of Defendants' role as investment advisors and brokers and pursuant to Regulation BI, 84 Fed. Reg. 134; the Investment Advisers Act, 17 C.F.R. § 276; and 950 C.M.R. § 12.207(1)(a). Defendants' duties also arose from their contractual obligations, to serve as Plaintiffs and Class members' agents under the Brokerage Agreement, including Defendants' holding and control over uninvested cash that belonged to clients, such as Plaintiffs and Class members.

103.    Defendants' duties to Plaintiffs and Class members, include, but are not limited to: (a) a duty of care to act in their best interests; (b) a duty to not place Defendants' interests above Plaintiffs' and Class members'; (c) a duty to use reasonable diligence, care, and skill; (d) a duty of loyalty and to avoid conflicts of interest; (e) a duty to disclose conflicts of interests; and (f) a duty to secure reasonable rates of interest on uninvested cash.

104.    Defendants breached their duties to Plaintiffs and Class members by, among other things: (a) failing to act in their best interests; (b) failing to act in Plaintiffs' and Class members' best interests by designing, implementing and operating the PNC Sweep Program in a manner that placed their own interests ahead of Plaintiffs' and Class members' interests; (c) failing to use reasonable diligence, care, and skill; (d) failing to avoid or mitigate conflicts of interests; and (e) failing to disclose or adequately disclose Defendants' conflict of interests. Any warnings or

statements that Defendants provided Plaintiffs and Class members were inadequate or insufficient because Defendants did not disclose the conflicts of interest that actually existed at the time they implemented the PNC Sweep Program and when Defendants automatically enrolled Plaintiffs and Class members in the PNC Sweep Program.

105.    As a direct and proximate result of Defendants' misconduct as alleged herein, Plaintiffs and Class members suffered damages in an amount to be determined at trial. Plaintiffs seek disgorgement of any undue and unjust gains of Defendants, punitive damages, as well as all other equitable relief deemed just and proper.

106.    Defendants' conduct also warrants a punitive damage award because Defendants are guilty of oppression and engaged in conduct that is outrageous and exhibited reckless indifference to the rights of their clients, including Plaintiffs and Class members.

## COUNT II
## GROSS NEGLIGENCE

107.    Plaintiffs re-allege and incorporate by reference all paragraphs as if fully set forth herein.

108.    Defendants owed Plaintiffs and Class members the duty to exercise reasonable diligence, care, and skill.

109.    Defendants breached their duties by failing to act in the best interests of Plaintiffs and Class members, including by not negotiating, at arm's length, and paying the available fair and reasonable interest rates on the cash balances in their clients' accounts; and by paying themselves unfair and unreasonable fees that were not designed to approximate the value for the services involved.

110.    Defendants' conduct as alleged in this Complaint was grossly negligent because their self-serving conduct demonstrates a complete lack of care and reckless disregard for their clients' interests. Defendants' conduct also demonstrates an extreme departure from the ordinary standard of care.

111.    Defendants' gross negligence directly and proximately caused harm to Plaintiffs and the Class members. As a result, Plaintiffs and Class members suffered damages in an amount to be determined at trial.

<u>**COUNT III**</u>
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

112.    Plaintiffs re-allege and incorporate by reference all paragraphs as if fully set forth herein.

113.    The Brokerage Agreement, entered into by Defendants on the one hand and Plaintiffs and Class members on the other, provides that Massachusetts law applies to services offered by Defendants, including the PNC Sweep Program.

114.    Under Massachusetts' common law, a covenant of good faith and fair dealing is implied into every contract.

115.    Plaintiffs and Class members contracted with Defendants to provide them with financial and/or investment services, pursuant to the Brokerage Agreement. Advisor clients paid Defendants advisor fees. Under the Brokerage Agreement, Defendants were agents and/or financial advisors to Plaintiffs and Class members and owed them fiduciary duties, including to act in their best interests. Defendants failed to obtain for Plaintiffs and Class members reasonable rates of return on their cash balances and instead elevated their own interests above their clients and paid themselves increased fees. Moreover, under the Brokerage Agreement, and pursuant to Reg. BI, 84 Fed. Reg. 134, 17 C.F.R. § 276, and 950 CMR 12.207(1)(a), Defendants had a duty to act in the best interests of Plaintiffs and Class members and not put their interests above Plaintiffs and Class members.

116.    These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the covenants that Defendants would act fairly and in good faith in carrying out their contractual obligations to

provide Plaintiffs and Class members with fair and reasonable rates of return on their cash balances.

117.    Defendants breached these implied covenants of good faith and fair dealing by failing to provide Plaintiffs and Class members with fair and reasonable interest rates on their cash sweep balances. Defendants, instead of providing fair and reasonable interest rates on their clients' cash sweep balances, provided far below fair and reasonable interest rates than their clients could have otherwise earned on their cash. Defendants acted dishonestly and failed to exercise and/or abused their discretion unreasonably in selecting its affiliate, PNC Bank, and allowing it to set the interest rates on cash sweep balances that are below fair and reasonable, and in paying Defendants and their affiliates fees that are unfair, unreasonable, and excessive.

118.    Plaintiffs and Class members fulfilled all the terms and obligations of their contract, including paying for Defendants' services.

119.    Defendants' failure to act in good faith in providing fair and reasonable rates of return on their customers' cash sweep balances and failure to act in their best interests denied Plaintiffs and Class members the full benefit of their bargain. Plaintiffs and Class members received a minimal return on their cash sweep balances that were less than what they could have otherwise earned and less than their reasonable expectations under their contract with Defendants.

120.    As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

<u>**COUNT IV**</u>
**BREACH OF CONTRACT**

121.    Plaintiffs re-allege and incorporate by reference all paragraphs as if fully set forth herein.

122.    Plaintiffs and Class members entered into the Brokerage Agreement, whereby Defendants are obligated to provide Plaintiffs and Class members with financial and/or advisory services, including a contractual obligation to negotiate, at arms-length, for Plaintiffs and Class

members rates of return on their cash balances that are fair and reasonable, fees that are fair and reasonable, and to otherwise act in the best interest of the clients in the operation of the PNC Sweep Program.

123.    Plaintiffs and Class members, at all times, performed their obligations under the Brokerage Agreement.

124.    Pursuant to the Brokerage Agreement, Defendants were obligated, and continue to be obligated, to obtain fair and reasonable interest rates on customers' cash sweep balances, to charge only fair and reasonable fees, and to otherwise act in the best interests of their customers.

125.    Additionally, as to advisory account holders, Defendants were paid fees separately to act in the best interests of advisory clients and did not.

126.    As alleged herein, the rates of return paid to Plaintiffs and Class members on their cash sweep balances were unfair and unreasonable, and the increased net interest income and fees that Defendants extracted for themselves and their affiliates, when selecting affiliate PNC Bank as the participating bank, were also unfair, unreasonable, and excessive. As a result, Defendants breached the contract with Plaintiffs and Class members.

127.    Plaintiffs and Class members were harmed by Defendants' breach in that they did not receive fair and reasonable interest rates on their cash balances, and they sustained damages in an amount to be determined at trial.

## COUNT V
## UNJUST ENRICHMENT

128.    Plaintiffs re-allege and incorporate by reference all paragraphs as if fully set forth herein.

129.    Because of Defendants' wrongful conduct as alleged herein, Plaintiffs and Class members received unfair and unreasonable interest rates on cash balances in their brokerage accounts that than they would have in a reasonable and fair market.

130.    Because of Defendants' wrongful conduct as alleged herein, Defendants unjustly received a benefit at the expense of Plaintiffs and Class members in the form of increased interest income that belonged to Plaintiffs and Class members.

131.    Defendants wrongfully retained the benefits conferred on them by Plaintiffs and Class members.

132.    It would be unjust and inequitable to allow Defendants to retain these wrongfully obtained benefits.

133.    Plaintiffs and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Class defined above, respectfully request that this Court enter:

(a) An order certifying this case as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiffs as Class representatives, and appointing the undersigned as Class counsel;

(b) A judgment awarding Plaintiffs and Class members appropriate monetary relief, including actual damages, equitable relief, restitution, and disgorgement;

(c) An order entering injunctive and declaratory relief as appropriate under the applicable law;

(d) An order awarding Plaintiffs and the Class pre-judgment and/or post-judgment interest as prescribed by law;

(e) An order awarding reasonable attorneys' fees and costs as permitted by law; and

(f) All other and further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated: December 13, 2024          */s/ Rosemary M. Rivas*
Rosemary M. Rivas* (CA Bar. No. 209147)
Eric H. Gibbs* (CA Bar. No. 178658)

Rosanne L. Mah* (CA Bar No. 242628)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
(510) 350-9700 (tel.)
(510) 350-9701 (fax)
rmr@classlawgroup.com
ehg@classlawgroup.com
rlm@classlawgroup.com
*admitted pro hac vice*

Brian E. Johnson* (VA Bar No. 92815)
**GIBBS LAW GROUP LLP**
211 N. Union St., Suite 100
Alexandria, VA 22314
(510) 350-9700 (tel.)
bej@classlawgroup.com
*admitted pro hac vice*

Gary F. Lynch (PA ID No. 56887)
Nicholas A. Colella (PA ID No. 332699)
Patrick D. Donathen (PA ID No. 330416)
Connor P. Hayes (PA ID No. 330447)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
gary@lcllp.com
nickc@lcllp.com
patrick@lcllp.com
connorh@lcllp.com

*Attorneys for Plaintiffs and the Proposed Class*